LARSON and wife, Appellants, vs. SPLETT and wife, Respondents.

*September 8—October 5, 1954.*

For the appellants there were briefs by *Clark & Kenyon* of Tomah, and *Hale, Skemp, Nietsch, Hanson & Schnurrer* of La Crosse, and oral argument by *Ernest O. Hanson.*

For the respondents there was a brief by *Donovan, Gleiss, Goodman, Breitenfield & Gleiss* of Sparta, and oral argument by *Leo J. Goodman.*

MARTIN, J. Plaintiffs' complaint alleges damages as the result of misrepresentation, fraud, and deceit by defendants in the sale of the farm, in that (1) the cattle were infected with brucellosis, (2) the machinery was not in working condition, (3) one of the sows was not bred, and (4) certain portions of the land were not tillable.

The elements of fraud are stated in *International Milling Co. v. Priem* (1923), 179 Wis. 622, 624, 192 N. W. 68, as follows:

"To be actionable the false representation must consist, first, of a statement of fact which is untrue; second, that it was made with intent to defraud and for the purpose of inducing the other party to act upon it; third, that he did in fact rely on it and was induced thereby to act, to his injury or damage." (Citing cases.)

It is well established that fraud must be proven by clear and satisfactory evidence. *Bowe v. Gage* (1906), 127 Wis. 245, 106 N. W. 1074; *Richards v. Millard* (1911), 146 Wis. 552, 131 N. W. 365; *Milwaukee Worsted Mills v. Winsor* (1914), 157 Wis. 538, 147 N. W. 1068; *Putterman v. Goldman* (1928), 197 Wis. 233, 221 N. W. 650. In granting defendants' motion to direct the verdict, the trial court was of the opinion that sufficient evidence had not been presented to establish a case resting on fraud. With this we agree.

Plaintiff Harold Larson is forty-four years old and has been a farmer all his life. Just previous to buying the farm in question he operated a farm in Vernon county where he had a certified herd of cattle. He visited the Splett farm on three occasions before he agreed to purchase it. On each occasion he saw the cattle and said they "looked good." On the first visit he inquired whether the defendants' cows were free from disease or a good herd and Splett said, "They are a good herd as far as I know." The second time he asked if they had any trouble with brucellosis and Splett said, "No." On the third occasion he told Splett he wanted to know for sure before he bought the farm that the cattle were safe and Splett replied that he did not need to worry, they were good cows. Larson testified that he knew the way to find out whether cows have Bang's disease is to test them, but he did not ask Splett to test them. He knew it was not a tested herd when the sale was made. He took possession of the farm on February 28, 1951, and the sale was closed about March 1, 1951.

Plaintiffs contend that the cows were diseased prior to the sale and that defendants had knowledge of that fact when the cows were represented as being a "good herd" and free from disease.

Larson testified that on March 16, 1951, one of the cows gave birth to a sick calf and he called a veterinarian. The calf died and Larson buried it. When the veterinarian came Larson was not there and he never talked to him about the condition of the cow. The veterinarian was not produced on the trial. Larson testified:

"*Q.* And you never inquired after that what that cow had? *A.* No.

"*Q.* So you don't know at this time what the cow had, do you? *A.* No."

The following testimony by Larson is with respect to an alleged abortion in June, 1951:

"He had marked down some cows that was supposed to be in in May, but those cows didn't come in and they was almost dry, so one night she came in, she looked like something happened to her. I can't prove she wasn't bred. The next day or the third day it was she came around. I took the animal, took care of her. Then she didn't show up any more. It must have been I guess two months or so, then she came around. I went out again and I told Ed. I looked around for another animal, but in the meantime in August she had a fall. I called him in and he made two trips. Nothing showed up . . . it went on I guess way in May before I got the use of that cow. . . .

"There was one cow and that done it most of that year until in May, but she lost her calf in the spring, it was late that year when I bought, and then in May she came right around again. I called Ed. up, told him 'Ed. come down here' and they saw that cow in the barn. I told him I thought the cow lost another calf and it was five and a half months since it was bred. Ed. was there and saw the cow."

This is the entire testimony referred to as the June abortion. It is not clear that both excerpts refer to the same cow, but in any event there is no showing that Bang's disease was the cause of the abortion. Nor is this evidence sufficient to charge the defendants with knowledge that their herd was infected in March.

On August 10, 1951, a cow aborted and Larson called in Dr. C. J. Hodulik who testified that he made a blood test on the cow and "assumed it was Bang's disease," and that he attended the Larson cattle three or four more times in the following few months for the same purpose. On cross-examination he testified that although he "assumed" the cow had Bang's disease, the abortion could have been caused by some other condition. He stated that the cattle could have been a good herd in March, 1951, and be infected with the disease in August, 1951.

There is considerable testimony as to cows coming in heat frequently, aborting, and being low in milk production, all of which, plaintiffs argue, are symptoms of Bang's disease. But the evidence does not show that these incidents were probably occasioned by brucellosis rather than any other possible cause. Larson stated that he knew nothing about Bang's disease except that the way to determine whether cattle had it was to test them. While Dr. Hodulik said he assumed that the cow he examined in August had the disease, that statement carries little weight in the light of his admission that some other condition may have been the cause of the abortion. In order to find for the plaintiffs the jury would have had to base its verdict on speculation. There is not sufficient evidence to support a finding that Bang's disease was the cause of the abortions or other conditions complained of. The record does no more than raise a suspicion that it may

have been. As observed in *Tegen v. Chapin* (1922), 176 Wis. 410, 413, 187 N. W. 185:

"It may be said to be a matter of common knowledge that abortions occur occasionally, if not frequently, as a result of injury, straining, or from other natural causes having nothing to do with the animal's capacity to produce a matured calf in the usual course of time under ordinary normal conditions."

Even taking as a verity Dr. Hodulik's assumption that there was brucellosis in the herd in August, he testified that would be no indication that the cattle were infected at the time of sale. Plaintiffs argue that the cumulative effect of all the incidents testified to indicates the presence of brucellosis at the time of the sale, but such a conclusion upon this record would be pure speculation.

And even if the record bore out this contention, which it does not, there is no evidence that defendants knew it. One of plaintiffs' witnesses, a cattle buyer, testified that, more than six years before, several of the Splett cows were sold to a New Jersey buyer and one of them reacted to the New Jersey test, although it had not reacted to the Wisconsin test. He also testified that the New Jersey test was much stronger than the Wisconsin test and the fact that the cow did not pass the New Jersey test did not mean it had Bang's disease. We cannot hold on this evidence that there was notice to the defendants that their herd was infected with brucellosis, and plaintiffs have offered no other proof that defendants knew or should have known that the cows were infected prior to the time of sale.

As to the machinery, the testimony is that defendants represented it as being eight to ten years old and in good running condition. Larson testified that he had worked with farm machinery all his life, that he looked over each item of this machinery before the sale and it "looked good." There was

no attempt made to run it because it was wintertime. He complained that the tractor was noisy and would not pull a three-section drag, but he cut silage with it. The evidence shows, however, that Larson did not act in reliance upon any representations of the defendants regarding the tractor:

"*Q.* Now as far as machinery is concerned, the tractor wasn't any good? *A.* That is right.
"*Q.* You knew that before you went on there? *A.* I did."

This is not the sort of evidence required to show fraud.

As to the grain binder and the corn planter, plaintiffs present no evidence of any values upon which to base a finding on damages. At one point in the record Larson testified that he thought the binder would be worth $700 if it was as represented, but at another point he stated that he thought all the machinery was worth about $700. As to the corn planter, Larson described his difficulty in getting it to work, but he placed no value on it at all. The agreement between the parties was for the sale of the entire farm property, including 147 acres of land, the buildings, cattle, horses, pigs, chickens, farm machinery, tools, etc., and the price was $25,000. According to Larson's own testimony, "just about the whole thing was lumped." The evidence falls far short of the degree of proof necessary to establish that plaintiffs were damaged in the sale of the machinery.

The representation as to the two sows was that they had been bred. One had a litter of pigs in due course but the other did not. As held in *Tegen v. Chapin, supra,* a warranty that an animal is a breeder does not amount to a guaranty that it will, at the end of the gestation period, have offspring. Splett's testimony shows that he had reason to believe the animal was bred and there is no evidence indicating that he knowingly misrepresented that fact.

Finally, plaintiffs complain that the soil in approximately four acres of bottomland is peat soil and untillable. When

Larson went out on the land it was covered with snow; he dug down in the upper end of the field and asked Splett if the rest of the land was like that. Splett said it was, except one part close to the creek bed, which was wet. Larson testified that when he bought the place he was more interested in the cattle than in the land and he knew it was rough, some good land and some poor land. No values are stated with respect to this bottomland and plaintiffs have failed to show any damage sustained because the four acres were not as represented.

There is nothing in this record to sustain plaintiffs' position that the trial court erred in directing the verdict. None of the evidence is clear and satisfactory. If the jury had been allowed to pass upon it, a finding for the plaintiffs would have been based on speculation and conjecture. As stated in *Hyer v. Janesville* (1898), 101 Wis. 371, 376, 77 N. W. 729:

"It has been said by this and other courts repeatedly, and is the established law, that a jury cannot properly be allowed to determine disputed questions of fact from mere conjecture. There must be some direct evidence of the fact, or evidence tending to establish circumstances from which a jury would be warranted in saying that the inferences therefrom clearly preponderate in favor of the existence of the fact, else the question should not go to the jury for determination at all. To allow a jury to reach a conclusion in favor of the party on whom the burden of proof rests, by merely theorizing and conjecturing, will not do. There must at least be sufficient evidence to remove the question from the realms of mere conjecture, else the trial court should pronounce the judgment of the law on the situation by taking the case from the jury when requested so to do." (Citing cases.)

*By the Court.*—Judgment affirmed.